IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| DAVID J. HASTINGS, on Behalf of Himself and All Others Similarly Situated, | ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CIVIL ACTION NO.: |
| | ) | |
| PRINCIPAL LIFE INSURANCE COMPANY; BENEFITS PLANS ADMINISTRATIVE COMMITTEE: BENEFITS PLANS INVESTMENT COMMITTEE, | ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

## CLASS ACTION COMPLAINT

Plaintiff David J. Hastings, individually and as a representative of a class of similarly situated persons, brings this action on behalf of current and former participants in the Principal Select Savings Plan for Employees ("Plan") and the Principal Select Savings Plan For Individual Field ("Field Plan") (the Plan and the Field Plan are collectively referred to as the "Plans," and their investment line-ups are virtually identical) against the Principal Life Insurance Company ("Principal"); the Benefit Plans Administrative Committee and the Principal managers who were its members (collectively, "Administrative Committee"); the Benefit Plans Investment Committee and the Principal managers who were its members (collectively, "Investment Committee") ("Plan Committees" means the Administrative Committee and the Investment Committee) (collectively, "Defendants").

## NATURE OF THE ACTION

1.      The Plans have had over $1 billion in assets since 2005.  Billion-dollar plans pay an average investment management fee of 25 basis points and median total plan fees of 30 basis points. (A basis point is .0001 and is the industry standard unit for measuring fees.)  The Plans paid substantially more than this.

2.      The Plan Committees decide what fees the Plans will pay and to whom.  The Chief Executive Officer of Principal appoints the Plan Committee members.  The members of the Plan Committees are Principal managers who answer to the CEO.  Principal pays the salaries and bonuses of the Plan Committee members.  The Plan Committee Members are not independent of Principal.  The Plan Committees ensured that nearly all investments and vendors for the Plans were Principal affiliates.

3.      Principal affiliates act as the primary investment advisor for the pooled separate accounts in which the Plans invests.  Principal affiliates charge a high investment advisor fee for

that service.  But Principal's affiliates hire subadvisors to do the essential work of portfolio management.  Principal does, however, keep much of the investment management fees.  The Plans could go straight to the subadvisor for the same service, cutting out Principal as a middleman, and pay less than what they pay now for the same service with millions of dollars of annual savings.

4.      The Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §1001 *et seq.*, requires Defendants to act solely in the interest of the Plans' participants when making decisions about selecting, removing, replacing, and monitoring the Plans' investments and vendors.  ERISA also requires Defendants to minimize the Plans' expenses.  Rather than fulfilling these fiduciary duties, described as "'the highest known to the law,'"[1] by offering Hastings and other participants in the Plans investment options and plan administration services at reasonable cost, Principal and its managers on the Plan Committees chose and maintained for the Plans Principal investment products and plan administrative services with high fees.

5.      Defendants chose and maintained Principal investment products and plan administration services because Principal, its subsidiaries, and its officers benefited financially from the fees.

6.      Defendants also breached their fiduciary duties by causing the Plans to maintain a vendor relationship with Principal for administrative services whereby the Plans paid, directly or indirectly, higher than reasonable fees to Principal for such services.

7.      This is a civil enforcement action under ERISA.  Plaintiff Hastings brings this action on behalf of the Plans for losses to the Plans and for disgorgement of unlawful fees, expenses, and profits taken by Defendants for the benefit of Principal and themselves.

---

[1]      *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) (citation omitted).

8.     This class action is brought on behalf of participants and their beneficiaries in the Plans who participated in either of the Plans from August 1, 2015 through the present ("Class Period").

## JURISDICTION AND VENUE

9.     This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331 because it is an action under 29 U.S.C. §1132(a)(2) and (3).

10.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 and ERISA §502(e)(1), 29 U.S.C. §1132(e)(1).

11.     Venue is proper in this district pursuant to ERISA §502(e)(2), 29 U.S.C. §1132(e)(2), because Defendants' principal place of business is located in this district.

## PARTIES

### I.     PLAINTIFF

12.     Plaintiff David J. Hastings ("Hastings") is a resident of Ankeny, Iowa.  Hastings participated in the Plan during the Class Period and invested in funds established and managed by Principal through his account in the Plan during the Class Period.

### II.     DEFENDANTS

13.     Principal Life Insurance Company ("Principal") is a life insurance, retirement plan recordkeeping, and investment services company, and a subsidiary of Principal Financial Group ("Principal Financial").  Principal is a fiduciary for the Plans because it established and administers the pooled separate accounts in which the Plans invest.  Principal is located in Des Moines, Iowa. Principal, through its Chief Executive Officer, is a fiduciary within the meaning of ERISA, and thus subject to high fiduciary standards because it appoints, monitors, and removes the members of the Plan Committees, which run the Plans as described below.

14.     Benefits Plans Administrative Committee ("Administrative Committee") is responsible for administering the Plans and is the named fiduciary for that purpose.   The Administrative Committee is a fiduciary of the Plans under 29 U.S.C. §1002(21) because it exercised discretionary authority or discretionary control respecting management of the Plans.   The Administrative Committee was responsible for selecting administrative service providers to the Plans and thus had discretionary authority or discretionary responsibility in the administration of the Plans and the disposition of its assets in the form of fees paid to such service-providers.   The members of the Administrative Committee are appointed by the Chief Executive Officer of Principal.   All the members of the Administrative Committee are officers or managers at Principal or of one of its affiliates.

15.     Benefits Plans Investment Committee ("Investment Committee") is responsible for investing and protecting the Plans' assets and is the named fiduciary for those purposes.   The Investment Committee is a fiduciary of the Plans under 29 U.S.C. §1002(21) because it exercised discretionary authority or discretionary control respecting management of the Plans and the disposition of the Plans' assets.   The members of the Investment Committee are appointed by the Chief Executive Officer of Principal.   All the members of the Investment Committee are officers or managers at Principal or of one of its affiliates.

## FACTS

## I.     THE PLANS

16.     The Plans are "employee pension benefit plans" within the meaning of ERISA §3(2)(A), 29 U.S.C. §1002(2)(A).

17.     The Plans are "defined contribution plans" within the meaning of ERISA §3(34), 29 U.S.C. §1002(34).

18.     The Plans cover eligible employees of Principal and its subsidiaries and affiliates.

19.     The Plans had 14,144 total participants and beneficiaries as of December 31, 2019.

20.     The Plans had total assets valued at approximately $2.96 billion as of December 31, 2019.

21.     The Investment Committee was responsible for selecting, evaluating, monitoring, and maintaining the Plans' investment options.

22.     The Administrative Committee or the Investment Committee was responsible for selecting, evaluating, monitoring, and maintaining the Plans' administrative service-providers.

23.     During the Class Period, the Plans invested in the following funds: Principal Guaranteed Interest Fund, Principal Core Plus Bond, Principal Diversified International, Principal Equity Income, Principal Government and High Quality Bond, Principal Inflation Protection, Principal International Emerging Markets, Principal Large Cap Growth, Principal Large Cap Growth I, Principal Large Cap Value, Principal Large Cap S&P 500 Index, Principal LifeTime Strategic Income, Principal LifeTime 2010, Principal LifeTime 2015, Principal LifeTime 2020, Principal LifeTime 2025, Principal LifeTime 2030, Principal LifeTime 2035, Principal LifeTime 2040, Principal LifeTime, 2045, Principal LifeTime 2050, Principal LifeTime 2055, Principal LifeTime 2060, Principal Mid Cap, Principal Small Cap Growth I, Principal Small Cap S&P 600 Index, Principal Small Cap Value II, Principal U.S. Property, Principal Diversified Real Asset, Principal Blue Chip, Principal Core Plus Bond, Principal LifeTime Hybrid Income, Principal LifeTime Hybrid 2010, Principal LifeTime Hybrid 2015, Principal LifeTime Hybrid 2020, Principal LifeTime Hybrid 2025, Principal Hybrid LifeTime 2030, Principal LifeTime Hybrid 2035, Principal LifeTime Hybrid 2040, Principal LifeTime Hybrid 2045, Principal LifeTime Hybrid 2050, Principal LifeTime Hybrid 2055, Principal LifeTime Hybrid 2060, Principal LifeTime Hybrid 2065, Principal Select Stable Value Separate Account, Principal Financial Group

Inc. Stock Separate Account ("Principal Stock Fund").  Except for the Principal Stock Fund, which invested in Principal Financial common stock, all of these are pooled investment funds established and marketed by Principal.  Principal charged investment management and other fees to these funds. The funds other than the Principal Stock Fund are collectively referred to as "Principal investment options."

## II.  ALMOST ALL OF THE PLANS' ASSETS ARE INVESTED IN PRINCIPAL INVESTMENT OPTIONS

24.     With the notional exception of a so-called "brokerage window" built into the Plans as a condition of an ERISA class action settlement the Plans entered into in 2015 (more on that to follow below),[2] the Plans invested exclusively in Principal investment options during the Class Period.

25.     There are many non-Principal-branded, reasonably priced and well-managed investment options in the 401(k) plan marketplace available to the Plans.  Such options include

---

[2]     As the United States Department of Labor ("DOL") has explained in regulatory guidance, an ERISA-covered retirement plan and its fiduciaries cannot reduce or eliminate their ERISA duty to monitor loyally and prudently retirement plan Designated Investment Alternatives like the Principal funds at issue in this case simply by opening a so-called "brokerage window" for plan participants featuring an array of investment funds managed by firms other than Principal.  (*See* https://www.dol.gov/agencies/ebsa/employers-and-advisers/guidance/field-assistance-bulletins/ 2012-02r ("Also, fiduciaries of such plans with platforms or brokerage windows, self-directed brokerage accounts, or similar plan arrangements that enable participants and beneficiaries to select investments beyond those designated by the plan are still bound by ERISA section 404(a)'s statutory duties of prudence and loyalty to participants and beneficiaries who use the platform or the brokerage window, self-directed brokerage account, or similar plan arrangement, including taking into account the nature and quality of services provided in connection with the platform or the brokerage window, self-directed brokerage account, or similar plan arrangement.") (last viewed February 10, 2021)).  *See also Pfeil v. State Street Bank and Trust Co.*, 671 F.3d 585, 597 (6th Cir. 2012) (overruled on other grounds) (citation omitted) ("A fiduciary cannot avoid liability for offering imprudent investments merely by including them alongside a larger menu of prudent investment options.  Much as one bad apple spoils the bunch, the fiduciary's designation of a single imprudent investment offered as part of an otherwise prudent menu of investment choices amounts to a breach of fiduciary duty, both the duty to act as a prudent person would in a similar situation with single-minded devotion to the plan participants and beneficiaries, as well as the duty to act for the exclusive purpose of providing benefits to plan participants and beneficiaries.").

registered mutual funds, exchange-traded funds, non-registered commingled funds such as bank collective or common trusts and insurance company pooled separate accounts, and separately managed single client funds.

26.     No one investment management firm is good at everything.   Some investment management firms excel at fixed income investment products, others at equity investment products, and still others at international and emerging market products.   Fiduciaries for large plans understand this and accordingly take a "best of breed" approach in assembling menus of retirement plan investment options for their retirement plan investors, carefully and diligently searching among the various vendors in the retirement plan investment product market to construct a suitable and appropriately low-cost diversified array of investment options.[3]

27.     Thus, only 10% of 401(k) plans restrict their investment options to those from a single investment management firm.[4]   Here, Defendants (again, with the notional exception of the "brokerage window") offered participants in the Plans as their retirement investment options **only Principal** investment options.   Fiduciaries of the Plans knew or should have known that no single investment management firm provides best-of-class investment fund offerings across in all asset classes.

28.     In an industry study, only 12% of retirement plans report a plan investment option menu consisting of 76%-100% investment funds that are affiliated with the particular retirement

---

[3]     *See* Russell Investments, *Seven Attributes of an Excellent Defined Contribution Plan*, at 2 (Feb. 2012).   Russell Investments is a retirement plan consultant and investment manager.   Its clients include Aetna, Inc., AT&T, Inc., Barclays Bank, Caterpillar, Chrysler Group LLC, Coca-Cola Bottling Co., Delta Airlines, Inc., and Toyota Motor Pension Fund, among others.   *See* http://www.russell.com/US/about_russell/default.asp (last visited Jan. 25, 2021).

[4]     *See* Deloitte Consulting LLC, Annual 401(k) Benchmarking Survey (2011) at 49, Figure 7.2 ("401(k) Survey").

plan's recordkeeping.[5]  The number of plans with a 100% proprietary line-up is even less.  The Plans are among the few with a nearly 100% line-up of investment options affiliated with the record keeper.

### III.   THE PLANS PAY HIGHER FEES TO PRINCIPAL THAN IS TYPICAL OF PEER MEGA PLANS

29.     Institutional investors, including mega plans, that is, retirement plans with assets over $1 billion such as the Plans, have substantial bargaining power in the market for retirement plan investment products.  It aggregates its assets under management when it bargains with portfolio managers over the fees for managing its commingled funds (mutual funds and pooled separate accounts) that it offers to the investing public.

30.     A prudent and loyal fiduciary for a mega-plan uses the bargaining power of the plan to negotiate low fees from investment managers.

31.     The Plans have had over $1 billion in assets since 2005 and have close to $3 billion in assets today.  Defendants should have considered whether the Plans' investments and fee arrangements remained suitable for plans of such size and whether they should leverage the Plans' substantial bargaining power to enter into new arrangements for investment options and other services to the Plans.

32.     Mega defined contribution plans commonly pay a weighted average total investment management fee of 25 basis points.[6]  The Plans paid a weighted average investment management fee significantly higher than 25 basis points in 2019.  Had the Plans paid a weighted average investment management fee of 25 basis points a year during the Class Period, they would have saved millions in investment management fees alone.

---

[5]      *See* 401(k) Survey at 49, Figure 7.3.

[6]      Plansponsor, Plansponsor's 2011 DC Survey: Points of Hue.

33.     Mega plans also pay comparatively low total fees.  According to a report by the Investment Company Institute ("ICI"), the trade association for the mutual fund industry, and BrightScope, a firm that provides fee benchmarking and other analyses of, and for, 401(k) plans, plans with more than $1 billion in assets average **total** plan costs of 28 basis points, with a median of 25 basis points.[7]  The Plans, however, featured weighted average ***total investment management fees*** of 33 points in 2020.

34.     Mega plans also tend to disfavor bundled service provider products, that is, where a single service provider provides investment, administration, record-keeping, and other services as part of a bundled set of services because bundled service arrangements tend to have higher fee structures.

35.     According to one survey, "smaller plans are more likely to pursue a bundled approach, while larger plans opt for a fixed-dollar per head approach . . . plans with a fixed-dollar per head fee model have lower reported recordkeeping, and trust and custody fees than the bundled plans."[8]

36.     For example, according to the 2014 NEPC Survey, 61% of plans that use fixed dollar arrangements have over $1 billion in assets.[9]

37.     The Plans use Principal for most or all services under a bundled service arrangement.

---

[7]     BrightScope and Investment Company Institute, The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, at 57-58, The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2017 (pdf).

[8]     NEPC 2014 Defined Contribution Plan & Fee Survey: What Plan Sponsors Are Doing Now, at 2 ("NEPC Survey").

[9]     NEPC Survey at 2.

IV.   **IN THE MARKETPLACE, PRINCIPAL'S PRODUCTS ARE USED ALMOST EXCLUSIVELY BY SMALL PLANS, NOT BILLION-DOLLAR CLIENTS LIKE THE PLANS HERE**

38.     A retirement plan database identified 4,467 defined contribution plans with plan assets greater than zero listing Principal as a service provider as of 2012.

39.     The 401(k) Survey finds that insurance companies provide recordkeeping services for about half of plans with under $10 million in assets, but only for 7.9% of plans with assets over $1 billion.[10]  Plans under $10 million pay much higher fees than plans over $1 billion.

40.     The Plans have more than $2 billion in assets.  Yet, the Defendants caused the Plans to use Principal products and services that are more commonly used by small retirement plans. Defendants failed to leverage the bargaining power of the Plans to reduce investment management and other fees charged by Principal and Principal affiliates to the Plans.

V.    **PRINCIPAL CHARGED THE PLANS UNREASONABLE INVESTMENT MANAGEMENT FEES**

41.     The Plans invest or invested in between 20 and 30 pooled separate accounts at times during the Class Period (*i.e.*, the Principal investment options).  A pooled separate account is a commingled investment fund with an investment strategy generally matching its name.

42.     Some of the Principal investment options hold a portfolio of securities directly. Other Principal investment options simply invest in an underlying mutual fund established and marketed by Principal affiliates ("Principal Mutual Fund(s)").  Various investment management, administrative, and other fees are charged to the Principal investment options and Principal Mutual Funds.

---

[10]       *Id.* at 35.

A.     **The Plans Paid Principal Unreasonable Investment Advisor Fees**

43.     Every Principal Fund in the Plans has an "investment advisor" (also sometimes called an "investment manager") and one or more "subadvisors."  Some of these arrangements occur at the separate account level for those Principal investment options that hold securities directly, and some at the level of the underlying Principal Mutual Fund where the Principal Fund simply invests in such a mutual fund.

44.     For example, the Intermediate Core-Plus Bond Separate Account identifies Principal Global Investors as the Investment Manager or Sub-Advisor.  The portfolio managers of each Principal Fund are employed by the subadvisor.  Thus, in each case, the core service of a given Principal Fund, portfolio management, is provided by the subadvisor, not the advisor.  In other words, the subadvisor makes the decisions about which securities to buy, sell, or hold as to funds it subadvises.  These arrangements for the Plans' investments are illustrated below in Table 1.

TABLE 1

| Fund Name | Investment Manager | Sub-Adviser |
|---|---|---|
| Principal Select Stable Separate Account | Principal Life Insurance Company | Morley Capital Management (Wholly owned subsidiary of Principal Financial Group) |
| Principal Plus Bond Separate Account | Principal Life Insurance Company | Principal Global Investors |
| Principal Government & High Quality Bond Separate Account | Principal Life Insurance Company | Principal Global Investors |
| Principal LifeTime Hybrid Income CIT | Principal Life Insurance Company | Principal Global Investors |
| Principal LifeTime Hybrid 2010 CIT | Principal Life Insurance Company | Principal Global Investors |
| Principal LifeTime Hybrid 2015 CIT | Principal Life Insurance Company | Principal Global Investors |
| Principal LifeTime Hybrid 2020 CIT | Principal Life Insurance Company | Principal Global Investors |
| Principal LifeTime Hybrid 2025 CIT | Principal Life Insurance Company | Principal Global Investors |

| Fund Name | Investment Manager | Sub-Adviser |
|---|---|---|
| Principal LifeTime Hybrid 2030 CIT | Principal Life Insurance Company | Principal Global Investors |
| Principal LifeTime Hybrid 2035 CIT | Principal Life Insurance Company | Principal Global Investors |
| Principal LifeTime Hybrid 2040 CIT | Principal Life Insurance Company | Principal Global Investors |
| Principal LifeTime Hybrid 2045 CIT | Principal Life Insurance Company | Principal Global Investors |
| Principal LifeTime Hybrid 2050 CIT | Principal Life Insurance Company | Principal Global Investors |
| Principal LifeTime Hybrid 2055 CIT | Principal Life Insurance Company | Principal Global Investors |
| Principal LifeTime Hybrid 2060 CIT | Principal Life Insurance Company | Principal Global Investors |
| Principal LifeTime Hybrid 2065 CIT | Principal Life Insurance Company | Principal Global Investors |
| Principal Equity Income Separate Account | Principal Life Insurance Company | Principal Global Investors |
| Principal Large Cap Growth I Separate Account | Principal Life Insurance Company | Principal Portfolio Strategies (30% of the fund and T Rowe Price and Brown Advisory remaining 70% of fund) |
| Principal Large Cap S&P 500 Index Separate Account | Principal Life Insurance Company | Principal Global Investors |
| Principal Mid Cap Separate Account | Principal Life Insurance Company | Principal Global Investors |
| Principal Small Cap S&P 600 Index Separate Account | Principal Life Insurance Company | Principal Global Investors |
| Principal Small Cap Value II Separate Account | Principal Life Insurance Company | Principal Portfolio Strategies (30% of the fund and Vaughan Nelson, LA Capital, and Hochkis &Wiley manage remaining 70% of fund) |
| Principal U. S. Property Separate Account | Principal Life Insurance Company | Principal Real Estate Investors |
| Principal Diversified Real Asset CIT Tier 2 | Principal Life Insurance Company | Principal Global Investors |
| Principal Guaranteed Interest | Principal Life Insurance Company | Principal Global Investors |
| Principal Inflation Protection | Principal Life Insurance Company | BlackRock Financial Management, Inc., |

| Fund Name | Investment Manager | Sub-Adviser |
|---|---|---|
| | | Blackrock International Limited (sub advisor) |
| Principal International Emerging Markets Separate Account | Principal Life Insurance Company | Origin Asset Management (Wholly owned subsidiary of Principal Financial Group) |
| Principal Large Cap Growth Separate Account | Principal Life Insurance Company | Principal Portfolio Strategies (30% of the fund and T Rowe Price and Brown Advisory remaining 70% of fund) |
| Principal Large Cap Value Separate Account | Principal Life Insurance Company | Principal Global Investors |
| Principal LifeTime Strategic Income Separate Account | Principal Life Insurance Company | Principal Global Investors |
| Principal LifeTime 2010 Separate Account | Principal Life Insurance Company | Principal Global Investors |
| Principal LifeTime 2015 Separate Account | Principal Life Insurance Company | Principal Global Investors |
| Principal LifeTime 2020 Separate Account | Principal Life Insurance Company | Principal Global Investors |
| Principal LifeTime 2025 Separate Account | Principal Life Insurance Company | Principal Global Investors |
| Principal LifeTime 2030 Separate Account | Principal Life Insurance Company | Principal Global Investors |
| Principal LifeTime 2035 Separate Account | Principal Life Insurance Company | Principal Global Investors |
| Principal LifeTime 2040 Separate Account | Principal Life Insurance Company | Principal Global Investors |
| Principal LifeTime 2045 Separate Account | Principal Life Insurance Company | Principal Global Investors |
| Principal LifeTime 2050 Separate Account | Principal Life Insurance Company | Principal Global Investors |
| Principal LifeTime 2055 Separate Account | Principal Life Insurance Company | Principal Global Investors |
| Principal LifeTime 2060 Separate Account | Principal Life Insurance Company | Principal Global Investors |
| Principal Small Cap Growth I Separate Account | Principal Life Insurance Company | Principal Portfolio Strategies (30% of the fund and AB, Brown Advisory and Emerald manage remaining 70% of the fund) |

| Fund Name | Investment Manager | Sub-Adviser |
|---|---|---|
| Principal Diversified International Separate Account | Principal Life Insurance Company | Principal Global Investors |
| Principal Blue Chip Separate Account | Principal Life Insurance Company | Principal Global Investors |

45.     As explained below, every one of the subadvisors for the Principal investment options (or underlying Principal Mutual Fund as the case may be) offers portfolio management services directly to institutional investors as a separately managed account (not to be confused with a pooled separate account, which is a commingled fund offered by an insurance company multiple investors) – in other words, a single client account.  This means that the Plans' fiduciaries could have negotiated directly with the subadvisor to a given Principal Fund held by the Plans for investment management matters rather than paying a Principal affiliate, Principal Global Investors.  But the Investment Committee did not do so.

46.     Asset managers generally offer their services to an array of clients.  Asset managers often serve as subadvisors to a mutual fund or other pooled investment fund established by a third party such as Principal Global Investors, which may or may not be affiliated with the subadvisor, and receive a subadvisory fee for managing the portfolio.  The third party in this case, Principal Global Investors, establishes, brands, administers, and markets the fund, but does not manage the portfolio.  The asset manager also may have clients that contract with it directly for the same investment management service, such as large institutional investors that prefer a separately managed account, thereby cutting out the middleman and its additional fees.  Although asset managers provide the same core portfolio management service (such as managing a large cap growth fund) to many different clients, the asset manager generally manages all of its clients' investments under a common investment strategy as one large portfolio, using accounting entries

to separate the portfolio into "silos" or "sleeves" for each particular client type (mutual funds, collective trusts, separately managed accounts, etc.).

47.     For example, according to a Statement of Additional Information ("SAI") (March 1, 2020) published by Principal, the Principal LargeCap Growth Fund I is sub-advised by Brown Advisory Incorporated and T Rowe Price Associates, with the individual portfolio managers identified as Kenneth M. Stuzin (Brown), Robert W. Sharps and David Rowlett (TRP).  The Brown Advisory SAI reveals that Mr. Stuzin has one registered investment company client with a $1.5 billion stake in his LargeCap Growth Fund I portfolio, likely Principal's mutual fund bearing that name.  The remaining of his 92 accounts, with a total stake of $13.2 billion in the LargeCap Growth Fund I portfolio are almost certainly single clients – that is, separately managed accounts. In other words, an institutional client such as a large retirement plan could go directly to Mr. Stuzin to obtain his portfolio management service, cutting out the middleman who established and markets the pooled funds.  In fact, the vast majority of Stuzin's accounts in this fund – 99% – are not pooled funds but other accounts such as those of institutional investors who had the good sense to cut out the middleman.

48.     The average account balance for the "other" accounts managed by Stuzin is $127 million.  Thus, Stuzin will manage a single client separate account with an investment minimum of $1.5 million in his LargeCap Growth I portfolio.  One of the Plans had $61 million in the LargeCap Growth Fund I in 2019.

49.     The Plans could have invested with Stuzin directly, rather than through a Principal Fund.  Given the Plans' large investment in this portfolio, the Plans' fiduciaries could and should have negotiated for the most favorable fee terms with Stuzin for a separately managed account. Indeed, given Principal's sizable investment in Stuzin's portfolio via Principal's registered mutual

fund and other pooled funds, Principal could have obtained for its Plans the most favorable terms offered by Stuzin as part of a package deal by aggregating all of Principal's assets under management.

50.     Stuzin's fee for sub-advising the Principal LargeCap Growth Fund I is 22 basis points.  Defendants could have negotiated directly with Stuzin on behalf of the Plans for the same portfolio management service and obtained it at the same price, or even lower, via aggregation.

51.     Instead, Defendants chose to use Stuzin's portfolio management service through an investment in the Principal LargeCap Growth I Separate Account, which, in turn, invested in a Principal Mutual Fund of the same name (ticker PLGIX).  The investment management fee for the underlying mutual fund is 39 basis points.  The advisor for the mutual fund is Principal Global Investors, a Principal affiliate.  Principal Global Investors manages 30% of the fund and collects their fee after paying Brown Advisory and T Rowe Price.

52.     The Securities and Exchange Commission requires professional investment advisors to file a Form ADV annually, which contains information about the investment styles, assets under management, key officers of the firm, fees, and other information.

53.     According to Principal's Form ADV, each subadvisor used by PMC (except J.P. Morgan and Neuberger Berman Fixed Income, LLC) has agreed that assets of any existing registered investment company sponsored by Principal to which the subadvisor provides investment advisory services and which have the same investment mandate as the fund for which the fee is being calculated will be combined to aggregate assets for purposes of obtaining best pricing.  In other words, Principal can aggregate all its assets under management for purposes of obtaining the best pricing from the subadvisors.

54.     Subadvisors would readily have agreed to include the Plans in the aggregated assets to acquire and keep Principal's business.  Thus, the Plans could have obtained the best fee terms available to Principal had Defendants used the Plans' assets and bargaining power to the Plans' advantage.  Defendants chose not to do so.

55.     The same retained investment management fee is present in all of the pooled separate accounts in which the Plans invested, as listed below in Table 2 (based on 2019 data).  Every subadvisor to these Principal investment options or underlying Principal Mutual Funds offers its portfolio management service as a separately managed account:

TABLE 2

| Principal Fund | Principal Global Investors Management Fee BP | Other Sub Advisor Fee | PGI Retained Management Fee BP | PGI Percent of Management Fee Retained |
|---|---|---|---|---|
| Principal Inflation Protection Separate Account | 40 | 8 | 32 | 80% |
| Principal Large Cap Growth I | 68 | 25 | 43 | 63% |
| Principal Small Cap Value II | 100 | 40 | 60 | 60% |
| Principal Small Cap Growth I | 88 | 46 | 42 | 47% |
| Principal Diversified Emerging Markets | 105 | 36 | 69 | 65% |

56.     The weighted average fee for the Plans' investments in the above-listed funds, taking into account the amount invested in each fund, is 53 basis points.  The weighted average subadvisor fee is 19 basis points, a difference of 34 basis points.  Thus, on an asset-weighted basis, the Plans paid almost two and a half times what they would have paid had they purchased the portfolio services of the subadvisors to the Principal Fund directly.

57.     One of the Plans invested $410,230,217 in these Principal investment options in 2019.

58.     The additional asset-weighted investment management fee paid by one of the Plans was over $1.4 million in 2019 alone, only one year of the Class Period.  Extrapolating to past years and from the end of 2015 to the end of 2019, that Plan paid approximately $4.8 million in additional investment management fees to Principal in connection with these pooled separate accounts during the Class Period.

59.     Defendants knew the Plans could have contracted directly with the subadvisors to the Principal investment options.  Principal negotiates with the subadvisors over their fee; Principal knows the investment break points and fee schedules; and several of the subadvisors including Edge, Origin, Morley, and PGI are Principal affiliates.  Thus, Defendants knew that the investment services they maintained for the Plans were available at a much lower cost.

**B.     The Plans Paid Additional and Unreasonable Investment Management Fees for Those Separate Accounts that Invested in Mutual Funds**

60.     Twelve of the Principal investment options invest or invested in underlying Principal Mutual Funds that charge additional investment management fees to Principal.  They are the Principal Mid Cap, Principal Small Cap Growth I, Principal Small Cap S&P 600 Index, Principal Small Cap Value II, Principal Diversified Real Asset, Principal Core Plus Bond, Principal Diversified International, Principal Equity Income, Principal Government and High Quality Bond, Principal International Emerging Markets, Principal Large Cap Growth, and Principal Large Cap S&P 500 Index.

61.     Principal charges an investment management fee to Principal investment options. This investment management fee is in addition to the investment advisor and subadvisor fees charged to the Principal Mutual Funds in which these 13 Principal investment options invest.  But Principal itself does not actually manage any assets in the 13 Principal investment options that simply hold Principal Mutual Funds.  The portfolio management is performed by the subadvisor to

the underlying mutual fund.  These arrangements are set forth in Table 4 below.  The LifeTime and LifeTime Hybrid funds are comprised of Principal mutual funds, however, they do not have this additional fee added to them.

TABLE 4

| SEPARATE ACCOUNT | 2019 PLAN ASSETS | 2019 FEE | BASIS POINTS |
|---|---|---|---|
| Lifetime 2020 | $60,037,844.00 | $167,685.24 | 28 |
| Lifetime 2030 | $87,549,253.67 | $244,971.86 | 28 |
| Lifetime 2040 | $71,459,823.92 | $197,517.22 | 28 |
| Lifetime 2050 | $48,447,776.82 | $122,762.80 | 25 |
| Principal MidCap Growth I | $260,336,099 | $390,504 | 15 |
| Principal SmallCap Growth I | $81,936,568 | $122,905 | 15 |
| Principal Small Cap S&P 600 Index | $179,341,768 | $269,013 | 15 |
| Principal Small Cap Value II | $26,419,909 | $39,629 | 15 |
| Principal Diversified Real Asset | $4,678,946 | $7,018 | 15 |
| Principal Core Plus Bond | $119,949,368 | $179,924 | 15 |
| Principal Diversified International | $163,986,045 | $245,979 | 15 |
| Principal Equity Income | $135,030,028 | $202,545 | 15 |
| Principal Government and High Quality Bond | $40,609,869 | $60,915 | 15 |

| Principal Inflation Protection | $27,238,212 | $40,857 | 15 |
| Principal International Emerging Markets | $104,797,500 | $157,196 | 15 |
| Principal Large Cap Growth I | $172,811,028 | $259,217 | 15 |
| Principal Large Cap S&P 500 Index | $369,516,194 | $554,275 | 15 |

The additional investment management fees paid by one of one of the Plans in 2019 to Principal in connection with the 13 Principal investment options listed in Table 4 totaled approximately $2,529,977.  Extrapolating from the end of 2015 to the end of 2019, the Plan paid approximately $8 million to $10 million in additional investment-management fees to Principal in connection with these pooled separate accounts during the Class Period.

## VI.   RED FLAGS DURING THE CLASS PERIOD SHOULD HAVE CAUSED DEFENDANTS TO EVALUATE WHETHER PRINCIPAL FUNDS WERE SUITABLE INVESTMENTS FOR THE PLANS

62.     Principal maintains a due diligence team that evaluates subadvisors for its pooled funds quarterly based on investment guidelines when each subadvisor is hired.  The monitoring process involves quantitative and qualitative assessments.  According to Principal, the most common and important form of quantitative assessment is the periodic review of historical investment performance.  Qualitative assessments involve measuring the level of active management risk, style/sector consistency, up market/down market performance, and attribution analysis for sources of value-added.

63.     Based on the subadvisor's quantitative or qualitative score, Principal may place the subadvisor on its internal watch list, which reflects a cautionary status that triggers a more focused and in-depth review of the investment manager.  Principal may also place a subadvisor on

probatory status, which is only removed once the subadvisor scores high enough on the quantitative scoring criteria.  Any subadvisor placed on the watch list or probationary status may be removed by Principal at any time.

64.     In Principal's October 21, 2020 Annual Report, there were certain Funds, and certain Subadvisors for multi-manager Funds, that had not attained during the relevant period(s) a level of investment performance considered satisfactory by the Board.  However, the Board considered the Manager's due diligence process for evaluating the performance of all Funds and all Subadvisors, for which they receive regular reporting, and concluded that the Manager has in place an effective due diligence process to monitor investment performance, to encourage remedial action and to make changes in the Subadvisors at the appropriate time, if necessary, even though the Subadvisors were not performing per their Advisory agreements.  The Board decided to keep the Subadvisors because "it is in the best interest of each fund."

65.     An article published on the 401khelpcenter.com website authored by Donald Stone, Accredited Independent Fiduciary,[11] states that ERISA fiduciaries should consider several criteria when evaluating funds.  Among other things, plans should avoid having their plan investments comprising more than 5% of the assets in any given fund.

66.     The Plans comprised over 6% of the assets of the Principal Diversified International Separate Account in 2019.

67.     The Plans comprised over 14% of the assets of the Principal Large Cap S&P 500 Separate Account in 2019.

---

[11]     *See* Donald Stone, *Investment Selection and Monitoring: A Practical Approach to Best Practices*,     http://www.401khelpcenter.com/401k/stone_investment_selection.html#.YBG7yeh KhPY.

68.     The Plans comprised over 6% of the assets of the Principal LargeCap Growth I Separate Account in 2019.

69.     The Plans comprised over 10% of the assets of the Principal Mid Cap Separate Account in 2019.

70.     The Plan comprised over 6% of the assets of the Principal Small Cal S&P 600 Index Separate Account in 2019.

71.     Despite the foregoing warning signs within the Class Period, Defendants caused the Plans to remain invested in Principal investment options.

## VII.   PRINCIPAL FAILED TO MONITOR PRUDENTLY THE PLANS' INVESTMENTS IN PROPRIETARY PRINCIPAL-BRAND INDEX FUNDS

72.     Defendants breached their ERISA fiduciary duties by maintaining excessively expensive and poorly performing index funds in the Plan that were managed by Principal.

73.     An index fund is a passively managed, pooled investment product designed to mirror the performance of a particular benchmark index.  For example, S&P 500 index funds aim to track the Standard & Poor's 500 Index, a market capitalization-weighted index of the 500 largest publicly traded companies in the United States.  The marketplace for index funds has evolved such that for asset classes such as large cap stocks, small cap stocks, foreign stocks, and domestic bonds, there are generally dozens of different products available that track a benchmark index that tracks the particular asset class.  These products are not limited to the best-known index associated with the asset class.  For example, not only are there numerous products that track the S&P 500, there are also numerous products that track the Russell 1000, another index that tracks large-cap domestic stocks.  Regardless of the benchmark index that an investor wants to track, there will generally be several products in the marketplace from which to choose.

74.     The marketplace for index funds is highly competitive, with several companies offering index fund products that track benchmark indices with a high degree of precision while charging very low fees.

75.     The competitiveness of the marketplace for index funds is particularly acute within the retirement plan segment, given that retirement plans have the unique ability (because of their size) to invest in pooled investment vehicles such as separate accounts, which generally have lower expenses than comparable mutual funds.

76.     Over the past 10 years, multiple investment management companies have distinguished themselves in the marketplace by offering highly competitive index fund products based on several competitive advantages: a high degree of institutional expertise at indexing, sophisticated trading platforms that minimize trading costs, and a large asset base that provides economies of scale.  As a result, these companies – which include BlackRock, BNY Mellon, Northern Trust, State Street, and Vanguard[12] – have captured a very large percentage of market share of passively-managed assets among large plans and investors in the retirement plan segment.

77.     Though the marketplace for index funds is very competitive, that does not mean that the offerings are uniformly competitive.  Some index funds charge fees that are five, 10, or even 20 times higher than those charged by another fund tracking the exact same index.  Furthermore, a higher level of fees does not in any way correspond to a higher quality product.

78.     A prudent fiduciary primarily considers three interrelated factors when choosing which index fund to use to track the chosen index.  The first factor is cost.  Because an index fund,

---

[12]     BlackRock, BNY Mellon, Northern Trust, State Street and Vanguard all market their index fund products to other, unaffiliated managers.  *See Terraza v. Safeway*, No. 3:16-cv-03994-JST, ECF No. 84-19 (N.D. Cal. June 22, 2017) (report from Aon Hewitt reviewing available marketplace offerings for Safeway plan, listing BlackRock, Vanguard, State Street, Northern Trust, and BNY Mellon as the "top 5 index managers").

all things being equal, will produce returns equal to the performance of its benchmark index minus the fees charged by the index fund, fees are a significant determinant of index fund performance.

79.     The second factor is tracking error, which measures how far the index fund's return has historically deviated from the return of the benchmark index.  Any type of tracking error (whether positive or negative) is deemed undesirable because either type of variance demonstrates that the index fund's investments did not produce a return that mirrored that of the index, which is the fund's objective.  However, prudent fiduciaries pay particular attention to negative tracking error, meaning index fund performance that trails the underlying index.  Prudent fiduciaries pay particular attention to negative tracking error because while some sources of tracking error relate to tracking failure, and can result in either outperformance or underperformance, some causes of tracking error – cash drag, inefficient trading systems, and illiquidity – have a generally negative effect on performance.  Because chronically negative performance is worse than merely random performance, prudent fiduciaries will seek to avoid index funds that consistently underperform their index on a pre-fee basis, as it will tend to indicate a manager plagued by cash drag, inefficient trading, or illiquidity.  Further, because issues with trading efficiency, cash drag, and illiquidity all relate to the amount of assets within the index fund and the skill of the managers, they tend to replicate over time, and thus are often predictive of future underperformance.

80.     The third factor that prudent fiduciaries will consider in evaluating an index fund are institutional experience and assets under management.  As explained by EnnisKnupp, the investment consultant to Illinois' State Universities Retirement System, "Years of indexing experience and passive assets under management are important metrics to review when looking at passive managers.  Firms with large amounts of passive assets under management are able to leverage their size and scale to more closely track the benchmark.  In addition, firms that have

multiple indexed products tend to show more commitment (*e.g.*, engage in a greater effort to minimize trading costs) than firms for which indexing is a small part of their business."[13]  Thus, in assessing a particular index strategy, a prudent fiduciary will look at each manager's experience managing the particular strategy and the amount of assets managed according to that strategy.[14]

81.     Taken together, in reviewing index fund managers, a prudent fiduciary will look at fees, tracking error, performance history, the manager's experience, and the manager's assets under management with the particular strategy and more broadly within the asset class.[15]

82.     Further, given the competitiveness of the index fund marketplace, and the rapid evolution of available index fund products, prudent managers of large investment portfolios that include index fund holdings will closely monitor the cost and performance of the index funds in their portfolio, while regularly comparing that cost and performance to the fund's closest competitors, making changes when warranted based on the fees, tracking error, and institutional quality of available products.

83.     There were numerous investment managers in the marketplace, including BlackRock, BNY Mellon, Northern Trust, State Street, and Vanguard, that throughout the relevant period offered products tracking the S&P 500, Mid Cap S&P 400 Index, and/or Small Cap S&P 600 indexes with a high degree of precision, while charging very low fees.

84.     Defendants failed to adequately investigate these marketplace alternatives in selecting and retaining funds for the Plan that tracked these indexes, choosing instead to offer

---

[13]     Hewitt EnnisKnupp Report to Illinois State Universities Retirement System Board of Trustees at 3 (May 27, 2010) (hereinafter "Hewitt Index Fund Report").

[14]     Hewitt Index Fund Report at 4–5.

[15]     *See* Hewitt Index Fund Report at 2–8; Mercer Index Fund Report at 2, 5–18; Wilshire Index Fund Report at 2, 5–8.

Principal's excessively expensive and poorly performing index fund products as standalone investment options in the Plan.  Defendants selected and retained Principal's index funds despite the fact that they charged fees that were three to six times higher than the fees charged by more competitive options.

85.     Not only were the Principal index funds more expensive, they were of significantly lower quality than other options when it came to their sole function – tracking the underlying index. For the past decade or more, Principal's index funds have consistently had among the highest rates of tracking error among all index fund managers.  Furthermore, this tracking error has been consistently negative, meaning that Principal index funds are among the worst performing index funds in the entire marketplace even on a *pre-fee* basis.

86.     Institutional factors also demonstrate the superiority of passive managers other than Principal.  Vanguard, State Street, Northern Trust, and BlackRock have been managing index fund investments for over 40 years; each company manages over $300 billion in indexed assets (with BlackRock, State Street, and Vanguard managing over $1 trillion in passive investments); and each company offers over 100 different passive investment strategies.  By comparison, Principal manages under $50 billion in index fund assets, has been managing index fund investments for a shorter period of time, and offers only five index fund strategies to its clients.

87.     As noted, Defendants retained as standalone investment options for the Plans several Principal index fund products, including the Principal Large Cap S&P 500 Index, Mid Cap S&P 400 Index, and Small Cap S&P 600 Index fund products.  These investment options were retained by Defendants even though a reasonable investigation of marketplace alternatives, consistent with the practice of other fiduciaries of other 401(k) plans, would have revealed superior alternatives with lower fees and tracking error.

### A.      Principal Failed to Monitor Prudently the Plans' S&P 500 Index Fund

88.      The retention of the Principal index fund products as standalone investment options was imprudent.  As an example of Defendants' failure to prudently investigate index fund options, below is a performance chart covering the years 2013 through 2018 for the S&P 500 Index itself, the Principal Large Cap S&P 500 Index Fund offered as a standalone investment in the Plans, and several other S&P 500 index fund products offered in the retirement plan marketplace, along with the average over/under performance during those years.  Other columns show the average annual tracking error during the time period, and the annual fee for each product as of December 31, 2017.

| | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | Avg Over/Under Performance 2010-2018 | Avg Tracking Error 2010-2018 | Fee[16] |
|---|---|---|---|---|---|---|---|---|---|
| S&P 500 Index | 32.39 | 13.69 | 1.38 | 11.96 | 21.83 | -4.38 | | | n/a |
| Principal Large Cap S&P 500 Index Sep Acct-I5 | 32.23 -.16 | 13.52 -.17 | 1.33 -.05 | 11.88 -.08 | 21.72 -.11 | -4.43 -.05 | -.09%/yr | 9.1 bps | .06% |
| Blackrock Equity Index NL F | 32.35 -.04 | 13.68 -.01 | 1.38 0 | 11.97 +.01 | 21.83 0 | -4.39 -.01 | 0 | 1.8 bps | .01% |
| State Street S&P 500 Index NL–C1 A | 32.42 +.03 | 13.66 -.03 | 1.39 +.01 | 11.97 +.01 | 21.84 +.01 | -4.40 -.02 | +.01%/hr | 2.2 bps | .01% |
| Northern Trust S&P 500 Index NL-CI A | 32.35 -.04 | 13.67 -.02 | 1.38 0 | 11.96 0 | 21.82 -.01 | -4.41 -.03 | -.01%/yr | 1.3 bps | .01% |
| Vanguard Institutional Index (VIIIX) | 32.37 -.02 | 13.68 -.01 | 1.39 +.01 | 11.95 -.01 | 21.82 -.01 | -4.41 -.03 | -.01%/yr | 1.2 bps | .02% |

---

[16]      As of December 31, 2017.

89.     The chart shows that year after year, the Principal S&P 500 index fund significantly underperformed compared to both its benchmark index and index fund competitors in the marketplace.  The chart further shows that the Principal fund had the highest level of tracking error during this eight-year period and the highest fees.   Had Defendants been monitoring the performance and fees of the Principal index funds in the Plan and performed a reasonable investigation of marketplace alternatives, consistent with the practice of other similarly situated fiduciaries, there was ample evidence during every year of the relevant period that the Principal option should have been replaced with one of the more competitive alternatives in the marketplace such as those listed above, all of which were available to the Plans and to Defendants in the share class listed.

90.     The underperformance of Principal's S&P 500 index fund was consistent with evidence demonstrating the institutional superiority of Principal's competitors in the field of S&P 500 index tracking.  As of September 2014, Principal managed less than $20 billion of assets in S&P 500 index products, while Northern Trust, BlackRock, State Street, and Vanguard all managed between $138 billion and $400 billion in products tracking the S&P 500.  Additionally, these four companies have all been managing S&P 500 index-tracking products since the late 1970s, while Principal did not launch an S&P 500 index-tracking strategy until 2000.

**B.      Principal Failed to Monitor Prudently the Plans' S&P Midcap 400 Index Fund**

91.     As another example, Defendants retained the Principal MidCap S&P 400 Index Fund to track the S&P Midcap 400 despite the availability of marketplace options with superior long-term performance on a pre-fee basis, lower tracking error, and lower fees.  Below is a chart showing the annual performance from 2013 to 2017 of the S&P Midcap 400 Index itself, the Principal MidCap S&P 400 Index Fund offered as a standalone investment option in the Plan, and

several index fund products that track the S&P Midcap 400 Index and were used by the fiduciaries

of other plans.  The chart also shows the average tracking error of each product during this period

as well as each product's annual fee as of December 31, 2018.

| | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | Avg Over/Under Performance 2010-2018 | Avg Tracking Error 2910-2018 | Annual Fee[17] |
|---|---|---|---|---|---|---|---|---|---|
| S&P MidCap 400 Index | 33.50 | 9.77 | -2.18 | 20.74 | 16.24 | -11.08 | | | n/a |
| Principal MidCap S&P 400 Index Sep Acct-I5 | 33.32<br><br>-.18 | 9.65<br><br>-.12 | -2.25<br><br>-.07 | 20.59<br><br>-.15 | 16.14<br><br>-.10 | -11.18<br><br>-.10 | -.12%/yr | 12.1 bps | .06% |
| Blackrock Cap Equity Index NL F | 33.49<br><br>-.01 | 9.74<br><br>-.03 | -2.16<br><br>+.02 | 20.70<br><br>-.04 | 16.20<br><br>-.04 | -11.07<br><br>+.01 | -.03%/yr | 3.9 bps | .02% |
| State Street MidCap Index NL – C1 A | 33.48<br><br>-.02 | 9.77<br><br>0 | -2.20<br><br>-.02 | 20.71<br><br>-.03 | 16.25<br><br>+.01 | -11.09<br><br>-.01 | -.01%/yr | 1.9 bps | .02% |
| Northern Trust S&P MidCap 400 Index | 33.36<br><br>-.14 | 9.72<br><br>-.05 | -2.17<br><br>+.01 | 20.70<br><br>-.04 | 16.17<br><br>-.07 | -11.14<br><br>-.06 | -.08%/yr | 7.8 bps | .02% |

92.    The chart shows that year after year, the Principal midcap index fund significantly

underperformed both its benchmark index and its index fund competitors in the marketplace.  The

chart further shows that the Principal fund had the highest level of tracking error as well as the

---

[17]    As of December 31, 2017.

highest fees among these options.  Had Defendants been monitoring the performance of these index funds and performed a reasonable investigation of marketplace alternatives, consistent with the practice of other fiduciaries of 401(k) plans, they would have replaced the Principal mid-cap index option with one of the more competitive alternatives in the marketplace such as those listed above, all of which were available to Defendants in the share class listed above.

93.     The underperformance of Principal's mid cap index fund was consistent with evidence demonstrating the institutional superiority of Principal's competitors in the field of S&P Midcap 400 index tracking. BlackRock, Northern Trust, and State Street all had several years more experience with mid-cap indexing than Principal.  According to data from Morningstar, as of the end of 2017, Principal managed $3.5 billion in assets tracking the S&P MidCap 400 Index (excluding monies invested by collective investment trusts managed by Principal itself), while Northern Trust, BlackRock, and State Street all managed between $5 billion and $22 billion in products tracking the same index.

94.     Had Defendants been monitoring the performance of the Principal index funds and performed a reasonable investigation of marketplace alternatives, consistent with the practice of other similarly situated fiduciaries, they would have replaced the Principal mid cap index fund with a less expensive, better performing alternative.

**C.      Principal Failed to Monitor Prudently the Plans' S&P SmallCap 600 Index Fund**

95.     Defendants' retention of Principal's proprietary small cap index product was similarly imprudent.  While few investment managers offer a product that tracks the S&P SmallCap 600 Index, Vanguard began offering such a fund in 2010, and as the chart below shows, it would have been a superior option for participants.

| | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | Avg Over/Under Performance 2011-2018 | Avg Tracking Error 2011-2018 | Annual Fee[18] |
|---|---|---|---|---|---|---|---|---|---|
| S&P SmallCap 600 Index | 41.31 | 5.76 | -1.97 | 26.56 | 13.23 | -8.48 | n/a | n/a | n/a |
| Principal SmallCap S&P 600 Index Sep Acct-I5 | 41.07 -.24 | 5.74 -.02 | -2.10 -.13 | 26.44 -.12 | 13.25 +.02 | -8.62 -.14 | -.12%/yr | 10.9 bps | .06% |
| Vanguard S&P Small-Cap 600 Index (VSMSX) | 41.18 -.13 | 5.69 -.07 | -2.00 -.03 | 26.52 -.04 | 13.37 +.14 | -8.52 -.04 | -.04%/yr | 6.6 bps | .08% |

96.     The chart shows that year after year, the Principal small cap index option significantly underperformed the Vanguard index fund competitor.  The chart further shows that the Principal option had higher tracking error, and that the tracking error was chronically negative. Institutional factors also favored Vanguard, given its experience and expertise in index tracking, and given that Vanguard managed at least 20 times more small-cap index tracking assets as of the end of 2017.  Had Defendants been monitoring the performance of the Principal index funds and performed a reasonable investigation of marketplace alternatives, consistent with the practice of other similarly situated fiduciaries, they would have replaced the Principal small cap index option with the corresponding Vanguard option or another comparable option.

## VIII.   PRINCIPAL FAILED TO MONITOR PRUDENTLY THE TARGET DATE FUNDS OFFERED THROUGH THE PLANS

97.     The proprietary Principal-branded target date funds offered to the Class through the Plans were imprudent investment options, and Principal violated ERISA by failing prudently to

---

[18]     As of December 31, 2017.

monitor them and by failing to replace them with lower-cost, better-performing target date funds offered by investment managers not affiliated with Principal.

98.     A target date fund is a diversified investment providing exposure to a variety of asset classes, comprised mostly of equity and fixed income securities, with an investment mix that becomes more conservative as the fund's target (retirement) date approaches.  Target date funds are generally offered as a suite of funds with target dates staggered five to 10 years apart, allowing the participant to choose the target date that aligns with his or her estimated retirement date.  As of the end of 2017, the Principal target date funds consisted of 12 trusts: 11 options with a target date ranging from 2010 to 2060 (2010, 2015, 2020, etc.), and an option called Principal LifeTime Hybrid Income Fund designed for investors "who have reached their investment time horizon."

99.     The Principal target date funds have at all relevant times been managed using a fund-of-funds structure, meaning that the target date funds' assets are invested in other pooled investment products, which according to the Declaration of Trust can be mutual funds, collective investment trusts, and annuity separate accounts, among other options.  Through the end of 2017, the fees of each Principal target date fund consisted of four components: (a) a trustee fee of .04%, set by the Declaration of Trust; (b) operating expenses, which are deducted from the trust; (c) the service fee, which varies based upon the share class selected in the participation agreement, and ranges from 0 bps to 110 bps; and (d) the "fees charged by the underlying investments in the [Principal target date funds]."  The first, second, and fourth fee components were the same for all investors in a particular Principal CIT, while the service fee varied depending upon the share class selected by the participating plan.

100.    Because Principal target date fund investors (including members of the Class in this case) bear the expense of the underlying investment options, Defendants' decisions regarding which

underlying investment options to use directly determined the amount of fees paid by investors such as the Class members here, as well as the recipient of those fees.

101.    The Principal target date funds' investment process is described in their sales literature.[19]  First, Defendants determined which asset classes would make up the target date funds. Second, Defendants determined the percentage allocations to each of these asset classes throughout the investor's investment lifespan.  This gradually-shifting asset allocation is known as the "glide path" for a series of target date funds.  Third, Defendants constructed each Principal target date fund's investment portfolio, which involved "the selection and monitoring of the Target Date Funds' underlying investment options and investment managers."[20]

102.    Defendants' fiduciary breaches in this case relate entirely to this third step – the selection and monitoring of the Principal target date funds' underlying investment options.

103.    As part of this third step, Defendants determined that four asset classes should be represented through passively-managed investment portfolios, commonly known as "index funds": (1) large company domestic equities ("large cap stocks") would be represented by an index fund tracking the Standard & Poor's 500 Index ("S&P 500 Index"); (2) fixed income securities ("bonds") would be represented by an index fund tracking the Bloomberg Barclays Aggregate Bond Index; (3) midsize company domestic equities ("mid cap stocks") would be represented by an index fund tracking the S&P MidCap 400; and (4) small company domestic

---

[19]    Principal LifeTime Hybrid CITs brochure at 6 (Jan. 2018), https://secure02. principal.com/publicvsupply/GetFile?fm=PQ8820&ty=VOP&EXT=.VOP (hereinafter "2018 Brochure") (last visited Jan. 25, 2021); Declaration of Trust §§3.3, 3.5.

See, e.g., 2018 Brochure at 6; Principal Trust[SM] Target Date Collective Investment Funds brochure at 4 (May 2014), https://www.principal.com/allweb/docs/ris/investments/ profile/1/pj_1052.pdf (hereinafter "2014 Brochure") (last visited Jan. 25, 2021).

[20]    2014 Brochure at 4.

equities ("small cap stocks") would be represented by an index fund tracking the S&P SmallCap 600 Index.

104.    Throughout the Class period here, Defendants have used index funds tracking these specific indices to provide the Principal target date funds with exposure to these four asset classes, and at all relevant times these four index funds have represented 60% to 70% of the total assets of each of the Principal target date funds.

105.    Plaintiff does not challenge either the decision to use passive investments for these four asset classes or the index used to represent each asset class.  Defendants' fiduciary breaches here relate to *which* index funds they utilized to track each of these four indices, a determination that fell squarely within the scope of their fiduciary duties.

106.    As described above, the marketplace for index funds is highly competitive.  For most major market indices, one or more companies offer an index fund product that can track the index with a high degree of accuracy, while charging very low fees.  This is particularly true for large investors such as the Principal target date funds (which at all relevant times had over $2 billion invested in index fund investments), that can leverage their billions in investable assets to negotiate lower fees than what is available to the vast majority of investors.

107.    Defendants here did not use any of the competitive index fund offerings in the marketplace as underlying investments for the Principal target date funds, choosing instead to profit themselves and their affiliates by investing the retirement funds of Plaintiff and the Class here through the structure of the Principal target date funds exclusively in Principal's proprietary index funds, despite fees that were five to 15 times higher than marketplace alternatives that tracked the exact same index.  Not only were the Principal index fund products far more expensive than available market alternatives, they were also of significantly lower quality.  Compared to

marketplace alternatives, Principal's index funds deviated further from the benchmark index, and consistently had the worst performance even on a pre-fee basis.

108.     Given the high fees and history of poor performance of Principal's index funds, a prudent fiduciary of a multi-billion-dollar suite of target date funds acting in the best interest of the trust beneficiaries would have removed these proprietary index funds from the Principal target date funds at the beginning of the relevant period and replaced them with more competitive marketplace alternatives.

109.     Defendants' failure to do so has cost members of the Class who own the Principal target date funds through the Plans millions in investment losses compared to what they would have earned had Defendants acted in accordance with their fiduciary duties.

110.     Defendants' failure to exercise the level of prudence and loyalty expected under the circumstances is best illustrated by contrasting their conduct to that of other, similarly situated fiduciaries.  Fiduciaries of numerous other target-date collective investment trusts offered by companies such as Charles Schwab, JPMorgan, and Great-West all invested in non-proprietary index funds as underlying holdings, despite the fact that each of these financial services companies offers their own indexing products or services in the marketplace.  Tellingly, no fiduciaries of other target-date collective investment trusts (outside of fiduciaries affiliated with Principal) used Principal's index funds as underlying holdings.

111.     Defendants benefited in multiple ways from the use of Principal-brand index funds to form the underlying asset base of the Principal target date funds owned by Plaintiff and the Class through the Plans.  In addition to the fees earned by Defendants from the Class's investment in Principal target date funds through the Plans, Principal target date fund asset growth produced by the Plans' investment in Principal target date funds helped subsidize the operating costs of

Principal's index funds, making them more profitable to Principal. The impact on Principal's business interests has been substantial: more than half of the assets in Principal's large cap, mid cap, small cap, and bond index funds come from the Principal target date funds.

112.    As further evidence that Principal failed to follow a prudent process of monitoring the Plans' target date fund investments, Principal, between the 2017 and 2018 plan years, removed the Principal LifeTime 2010-2060 Sep Account-Z funds from the Plans and replaced them with their Principal LifeTime Hybrid 2010-2060 Collective Investment Trust funds. If Principal had incident to this change used an internal review process concerning the target date fund investment holdings of the Plans as required by regulatory guidance from the DOL, the Principal LifeTime Hybrid 2010-2060 Collective Investment Trust funds would not have risen to the top, as those funds by objective metrics trail competing target date funds in performance due to the fact that the Principal target date funds use the aforementioned high-cost and poorly-performing Principal brand index funds as underlying investments for Principal's target date fund complex. (*See* https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/fact-sheets/target-date-retirement-funds.pdf (describing prudent process for ERISA fiduciaries selecting and monitoring target date funds: "plan fiduciaries should engage in an objective process to obtain information that will enable them to evaluate the prudence of any investment option made available under the plan. For example, in selecting a TDF you should consider prospectus information, such as information about performance (investment returns) and investment fees and expenses") (last visited Jan. 25, 2021).

## IX.    PRINCIPAL FAILED TO NEGOTIATE REASONABLE RECORDKEEPING FEES

113.    The charges for recordkeeping services, especially for mega defined contribution plans, have declined since 2008.

114.     Had the Plans entered into an arms'-length relationship with Principal pursuant to an agreement negotiated by a prudent and unconflicted fiduciary, the Plans would have paid a per-participant fee annually substantially lower than they did.

115.     For the entire Class Period, the Plans should have paid, at most, approximately $2.5 million in recordkeeping fees to Principal (2015 to 2019).   In 2019 alone, the plan paid $2.2 million to Principal for its recordkeeping services.

116.     The Form 5500 reveals that Principal received both direct and indirect compensation from the Plans for providing recordkeeping services to the Plans.   The amount of indirect compensation is not disclosed in the Form 5500.

117.     The Administrative and/or Investment Committee breached their fiduciary duties by failing to negotiate recordkeeping fees, including a flat, per-participant fee.

## X.     THE CLAIMS OF PLAINTIFF AND THE CLASS HERE ARISE INDEPENDENTLY OF AND ARE NOT SUBJECT TO PRINCIPAL'S 2015 SETTLEMENT OF ERISA CLASS ACTION CONCERNING PRINCIPAL'S MANAGEMENT OF THE PLANS

118.     Principal, in 2015, settled class action litigation concerning some of the issues involved in this lawsuit.   In the words of the class settlement notice for the 2015 case:

> A lawsuit [] that was filed in the United States District Court for the Southern District of Iowa against Defendants.   The lawsuit involves claims that Defendants violated the federal Employee Retirement Income Security Act of 1974 ("ERISA"), by failing to comply with their responsibilities under ERISA to the Plans and participants of the Plans in the management of the Plans.   The Plan participant who filed the lawsuit ("Plaintiff") claims that Defendants acted improperly by selecting and maintaining proprietary Principal Life investment options in the Plans and charging excessive fees, paid to Principal Life, for the Plans' administrative services.   As a result, Plaintiff claims, participants of the Plans paid higher fees and obtained less return on their investment.

119.     The 2015 case settled on a classwide basis for $11 million, with a settlement being announced mere days after the class action complaint was filed.   (*See* https://www.prnewswire.com/

news-releases/judge-approves-11-million-settlement-with-principal-financial-300183986.html

(last visited Jan. 25, 2021).)

120.    The claims of Plaintiff and the Class in the instant matter are not barred and were

not released by this prior 2015 settlement.

121.    First, this complaint, among other things, concerns problems with the Principal

index and target date fund series used by Plaintiff and the Class that were not at issue in the 2015

case, that were unknown to Plaintiff at the time of the 2015 settlement and that were unknown to

Plaintiff until shortly before the commencement of this litigation.  Indeed, the 2015 case did not

concern any alleged fund performance-related problems stemming from, for instance, the failure of

Principal index funds included in the Plans to track accurately their relevant benchmarks (as this

case does) or related problems with use of those index funds as part of the asset base for Principal's

target date funds included in the Plans (as this case does).  So these structural problems with the

Principal-brand index and target date funds included as designated investment alternatives in the

Plans were not and, indeed, could not in any case have been (since they were never mentioned in

the 2015 case) "subjects for which changes are being made to the operation of the Plans" as part of

the 2015 litigation settlement, as the 2015 settlement's classwide notice put it.

122.    Second, this complaint more generally advances failure-to-monitor ERISA

allegations that were not at issue in the 2015 case and that, in any event, could not have been

released as a matter of law under ERISA in the 2015 settlement.  In a similar case in a nearly

identical procedural posture, another court recently declined to grant an ERISA retirement plan

sponsor judgment against a plaintiff class, stating as follows:

> The Plaintiffs argue, and the Court agrees, that the holding from *Tibble v. Edison
> Int'l*. suggests that there has been a sufficient "change in circumstances" justifying
> this new suit, because ***fiduciaries have a continual duty to monitor investments***.
> Pls.' Opp'n 12 (quoting 575 U.S. 523, 135 S. Ct. 1823, 1828, 191 L. Ed. 2d 795

(2015)).  In outlining this continual duty to monitor, the Supreme Court held that
"the trustee must 'systematic[ally] conside[r] all the investments of the trust at
regular intervals' to ensure that they are appropriate." *Tibble*, 135 S. Ct. at 1828
(alterations in original) (quoting Amy Morris Hess, George Gleason Bogert &
George Taylor Bogert, <u>The Law of Trusts and Trustees</u> §684, at 147-48 (3d ed.
2009) ("Bogert 3d")).   This continuing duty, combined with the case law
interpreting section 1110(a), must be given effect here. ***Fidelity could not contract
away this future duty to monitor by signing the Bilewicz release***.

*Moitoso v. FMR, LLC*, 451 F. Supp. 3d 189, 203, 206-07 (D. Mass. 2020) (emphasis added); *see*

*also Karg v. Transamerica Corp.*, No. 18-CV-134-CJW-KEM, 2019 WL 3938471, at *7-9 (N.D.

Iowa Aug. 20, 2019) (similar).

123.   So it should go here should Principal seek to interpose its 2015 settlement as a

bulwark against liability here.

## ERISA'S FIDUCIARY STANDARDS

124.   ERISA imposes strict fiduciary duties of loyalty and prudence upon the Defendants

as fiduciaries of the Plan. ERISA §404(a), 29 U.S.C. §1104(a), states, in relevant part, that:

> [A] Fiduciary shall discharge his duties with respect to a plan solely in the
> interest of the participants and beneficiaries and –

(A)   For the exclusive purpose of
    (i)   Providing benefits to participants and their beneficiaries; and
    (ii)   Defraying reasonable expenses of administering the plan;
(B)   With the care, skill, prudence, and diligence under the circumstances then
    prevailing that a prudent man acting in a like capacity and familiar with
    such matters would use in the conduct of an enterprise of like character
    and with like aims;
(C)   By diversifying the investments of the plan so as to minimize the risk of large
    losses, unless under the circumstances it is clearly prudent not to do so; and
(D)   In accordance with the documents and instruments governing the plan
    insofar as such documents and instruments are consistent with the provisions
    of this subchapter and subchapter III.

125.   ERISA also imposes explicit co-fiduciary duties on plan fiduciaries.  ERISA §1405,

29 U.S.C. §1105, states, in relevant part, that:

> In addition to any liability which he may have under any other provision of this part,
> a fiduciary with respect to a plan shall be liable for a breach of fiduciary

responsibility of another fiduciary with respect to the same plan in the following circumstances:

(1)      If he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or

(2)      if, by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

(3)      If he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

126.      Under ERISA, fiduciaries that exercise discretionary authority or control over the selection of plan investments and the selection of plan service providers must act prudently and solely in the interest of participants in the plan when selecting investments and retaining service providers.  Thus, "the duty to conduct an independent investigation into the merits of a particular investment" is "the most basic of ERISA's investment fiduciary duties."[21]   As the Department of Labor explains:

[T]o act prudently, a plan fiduciary must consider, among other factors, the availability, riskiness, and potential return of alternative investments for his or her plan.  [Where an investment], if implemented, causes the Plan to forego other investment opportunities, such investments would not be prudent if they provided a plan with less return, in comparison to risk, than comparable investments available to the plan, or if they involved a greater risk to the security of plan assets than other investments offering a similar return.[22]

127.      Pursuant to these duties, fiduciaries must ensure that the services provided to the plan are necessary and that the fees are reasonable:

Under section 404(a)(1) of ERISA, the responsible Plan fiduciaries must act prudently and solely in the interest of the Plan participants and beneficiaries both in deciding . . . which investment options to utilize or make available to Plan participants or beneficiaries.  In this regard, the responsible Plan fiduciaries must

---

[21]      *In re Unisys Savings Plan Litig.*, 74 F.3d 420, 435 (3d Cir. 1996).

[22]      DoL Ad. Op. No. 88-16A.

assure that the compensation paid directly or indirectly by the Plan to [service providers] is reasonable . . . .[23]

128.    A fiduciary's duty of loyalty requires a fiduciary to act solely in the interest of plan participants and beneficiaries.  As the Department of Labor has repeatedly warned:

> We have construed the requirements that a fiduciary act solely in the interest of, and for the exclusive purpose of providing benefits to, participants and beneficiaries as prohibiting a fiduciary from subordinating the interests of participants and beneficiaries in their retirement income to unrelated objectives.  Thus, in deciding whether and to what extent to invest in a particular investment, a fiduciary must ordinarily consider only factors relating to the interests of plan participants and beneficiaries in their retirement income.  A decision to make an investment may not be influenced by [other] factors unless the investment, when judged solely on the basis of its economic value to the plan, would be equal or superior to alternative investments available to the plan.[24]

129.    The Department of Labor counsels that fiduciaries are responsible for ensuring that a plan pays reasonable fees and expenses and that fiduciaries need to carefully evaluate differences in fees and services between prospective service providers:

> While the law does not specify a permissible level of fees, it does require that fees charged to a plan be "reasonable."  After careful evaluation during the initial selection, the plan's fees and expenses should be monitored to determine whether they continue to be reasonable.

> In comparing estimates from prospective service providers, ask which services are covered for the estimated fees and which are not.  Some providers offer a number of services for one fee, sometimes referred to as a "bundled" services arrangement.  Others charge separately for individual services.  Compare all services to be provided with the total cost for each provider.  Consider whether the estimate includes services you did not specify or want.  Remember, all services have costs.

> Some service providers may receive additional fees from investment vehicles, such as mutual funds, that may be offered under an employer's plan.  For example, mutual funds often charge fees to pay brokers and other salespersons for promoting the fund and providing other services.  There also may be sales and other related charges for investments offered by a service provider.

---

[23]    DoL Ad. Op. 97-15A; DoL Ad. Op. 97-16A.

[24]    DoL Ad. Op. No. 98-04A; DoL Ad. Op. No. 88-16A.

Employers should ask prospective providers for a detailed explanation of all fees associated with their investment options.[25]

In a separate publication, the Department of Labor writes:

Plan fees and expenses are important considerations for all types of retirement plans.  As a plan fiduciary, you have an obligation under ERISA to prudently select and monitor plan investments, investment options made available to the plan's participants and beneficiaries, and the persons providing services to your plan.  Understanding and evaluating plan fees and expenses associated with plan investments, investment options, and services are an important part of a fiduciary's responsibility.  This responsibility is ongoing.  After careful evaluation during the initial selection, you will want to monitor plan fees and expenses to determine whether they continue to be reasonable in light of the services provided.

\* \* \*

By far the largest component of plan fees and expenses is associated with managing plan investments.  Fees for investment management and other related services generally are assessed as a percentage of assets invested.  Employers should pay attention to these fees.  They are paid in the form of an indirect charge against the participant's account or the plan because they are deducted directly from investment returns.  Net total return is the return after these fees have been deducted.  For this reason, these fees, which are not specifically identified on statements of investments, may not be immediately apparent to employers.[26]

130.    A fiduciary under ERISA has a continuing duty to monitor investments and remove imprudent ones and a related continuing duty to monitor its investment advisors and remove imprudent ones.  A claim for breach of that duty of prudence requires an ERISA plaintiff to make factual allegations that would lead to an inference that the fiduciary's decision-making process in that regard was imprudent.  Plaintiffs may rely on circumstantial factual allegations to show a

---

[25]    U.S. Dept. of Labor, *Meeting Your Fiduciary Responsibilities* (May 2004) (http://www.dol.gov/ebsa/ publications/fiduciaryresponsibility.html) (last visited Jan. 25, 2021).

[26]    U.S. Dept. of Labor, *Understanding Retirement Plan Fees and Expenses* (May 2004) (http://www.dol.gov/ebsa/publications/undrstndgrtrmnt.html) (last visited Jan. 25, 2021).

flawed process in this regard.[27]   The facts alleged here support an inference that Defendants

followed an imprudent process – or, indeed, possibly no process at all – of monitoring the Plans'

investment options and investment advisors to ensure that only prudent investment options with

good performance and low fees were offered to Plaintiff and the Plans.[28]

## CLASS ALLEGATIONS

131.   Hastings brings this action on behalf of a class defined as:

All participants in The Principal Select Savings Plan for Employees and all
participants in The Principal Select Savings Plan for Individual Field from
August 1, 2015 to present.   Excluded from the class are Defendants,
Defendants' beneficiaries, and Defendants' immediate families.

132.   Class certification is appropriate under Fed. R. Civ. P. 23(a) and (b)(1), (b)(2), and/or

(b)(3).

133.   The class satisfies the numerosity requirement because it is composed of thousands

of persons, in numerous locations.   The Plans had over 10,000 participants and beneficiaries in

every year of the Class Period, all of whom invested in at least one of the Principal investment

options during the Class Period and all of whom suffered from the excessive fees charged by

Principal and/or poor performance of the Principal investment options.   The number of class

members is so large that joinder of all its members is impracticable.

134.   Common questions of law and fact include:

---

[27]      *See Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Centers Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d at 718-19 (2d Cir. 2013).

[28]      *See, e.g.*, *Pizarro v. Home Depot, Inc.*, No. 1:18-CV-01566-WMR, 2019 WL 11288656, at *5 (N.D. Ga. Sept. 20, 2019) (making inference of fiduciaries' lack of prudent process for monitoring plan investments and expenses and therefore denying motion to dismiss ERISA fiduciary action concerning alleged failure to monitor prudently plan investments and fees).

A.     whether Defendants caused the Plans to offer and maintain Principal proprietary investment options established or managed by Principal or its subsidiaries and affiliates;

B.     whether Defendants were fiduciaries responsible for monitoring and making decisions with respect to the investments in the Plans and services for the Plans;

C.     whether Defendants breached their fiduciary duties to the Plans by allowing the Plans to maintain their invested assets in Principal proprietary investment options;

D.     whether Defendants breached their fiduciary duties to the Plans by causing the Plans to pay, directly or indirectly, excessive recordkeeping and plan administration fees to Principal and its affiliates and subsidiaries;

E.     whether the investment and service-provider decisions made by Defendants were solely in the interests of participants of the Plans and beneficiaries of the Plans;

F.     whether Defendants breached their fiduciary duty by failing to defray reasonable expenses of the Plans; and

G.     whether the Plans suffered losses as a result of Defendants' fiduciary breaches.

135.     Hastings's claims are typical of the claims of the Class.  He has no interests that are antagonistic to the claims of the Class.  During the Class Period, Hastings invested in Principal proprietary investment options through his account in the Plan.

136.   Hastings will fairly and adequately protect the interests of the Class.   He is committed to the vigorous representation of the Class.   Hastings's counsel are experienced in class action and ERISA litigation.

137.   A class action is the superior method for the fair and efficient adjudication of this controversy.   Joinder of all members of the Class is impracticable.   The losses suffered by some of the individual members of the Class may be small, and it would therefore be impracticable for individual members to bear the expense and burden of individual litigation to enforce their rights. Moreover, Defendants, as fiduciaries of the Plans, were obligated to treat all Class members similarly as participants of the Plans pursuant to written plan documents and ERISA, which impose uniform standards of conduct on fiduciaries.   Individual proceedings, therefore, would pose the risk of inconsistent adjudications.   Hastings is unaware of any difficulty in the management of this action as a class action.

138.   This Class may be certified under Rule 23(b).

A.   23(b)(1).  As an ERISA breach of fiduciary duty action, this action is a classic 23(b)(1) class action.  Prosecution of separate actions by individual members would create the risk of (A) inconsistent or varying adjudications with respect to individual members of the Class that would establish incompatible standards of conduct for the Defendants opposing the Class, or (B) adjudications with respect to individual members of the Class that would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudication or substantially impair or impede their ability to protect their interests.

B.      23(b)(2).  This action is suitable as a class action under 23(b)(2) because the Defendants have acted or refused to act on grounds generally applicable to the Class as a whole, thereby making appropriate final injunctive, declaratory or other appropriate equitable relief with respect to the Class.

C.      23(b)(3).  This action is suitable to proceed as a class action under 23(b)(3) because questions of law and fact common to the members of the Class predominate over individual questions, and this class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Given the nature of the allegations, no class member has an interest in individually controlling the prosecution of this matter, and Plaintiff is aware of no difficulties likely to be encountered in the management of this matter as a class action.

## **CLAIM FOR RELIEF**

### **Fiduciary Breaches in Monitoring the Plans' Investments**

139.    Hastings repeats and realleges each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

140.    Defendants are bound by ERISA's duties of undivided loyalty and prudence.  These duties include, among other things, a continual duty to monitor the Plans' investments for suitability.  As the Supreme Court put it, an ERISA plan "trustee must 'systematic[ally] conside[r] all the investments of the trust at regular intervals' to ensure that they are appropriate."[29]

---

[29]      *Tibble v. Edison Int'l*, 575 U.S. 523, 135 S. Ct. 1823, 1828 (2015) (citation omitted).

141.     Defendants violated this duty with respect to the following Principal products held by Plaintiff and the Class in the Plans: Principal Guaranteed Interest Fund, Principal Core Plus Bond, Principal Diversified International, Principal Equity Income, Principal Government and High Quality Bond, Principal Inflation Protection, Principal International Emerging Markets, Principal Large Cap Growth, Principal Large Cap Growth I, Principal Large Cap Value, Principal Large Cap S&P 500 Index, Principal LifeTime Strategic Income, Principal LifeTime 2010, Principal LifeTime 2015, Principal LifeTime 2020, Principal LifeTime 2025, Principal LifeTime 2030, Principal LifeTime 2035, Principal LifeTime 2040, Principal LifeTime, 2045, Principal LifeTime 2050, Principal LifeTime 2055, Principal LifeTime 2060, Principal Mid Cap, Principal Small Cap Growth I, Principal Small Cap S&P 600 Index, Principal Small Cap Value II, Principal U.S. Property, Principal Diversified Real Asset, Principal Blue Chip, Principal Core Plus Bond, Principal LifeTime Hybrid Income, Principal LifeTime Hybrid 2010, Principal LifeTime Hybrid 2015, Principal LifeTime Hybrid 2020, Principal LifeTime Hybrid 2025, Principal Hybrid LifeTime 2030, Principal LifeTime Hybrid 2035, Principal LifeTime Hybrid 2040, Principal LifeTime Hybrid 2045, Principal LifeTime Hybrid 2050, Principal LifeTime Hybrid 2055, Principal LifeTime Hybrid 2060, Principal LifeTime Hybrid 2065, Principal Select Stable Value Separate Account.

142.     Defendants violated their duties by maintaining the Plans' investments in Principal proprietary investment options when they knew or should have known that the core investment manager services were available from the same subadvisors at much lower cost and knew of the performance and fee data described herein concerning Principal's target date and index fund complexes, which indicate that these funds were inferior retirement investments for Plaintiff and the Class.  This Court recently held that allegations closely similar to these suffice to state an

actionable ERISA failure-to-monitor claim against Principal concerning its management of its index and target date fund series.[30]

143.    Had Defendants acted exclusively for the purpose of defraying the Plans' expenses, and solely in the interests of the Plans, instead of acting in Principal's interests, the Plans would have saved millions of dollars in fees during the Class Period.

144.    Defendants therefore breached their fiduciary duties under 29 U.S.C. §1104(a)(1).

145.    As a direct and proximate result of these breaches, the Plans and class members lost millions of dollars in the form of additional fees.

146.    Pursuant to ERISA §§502(a)(2) and 409(a), 29 U.S.C. §1132(a)(2) and 29 U.S.C. §1109(a), Defendants are liable to disgorge all fees received from the Plans, directly or indirectly, and profits thereon, and restore all losses suffered by the Plans caused by their breaches of the duty of loyalty.

## **PRAYER FOR RELIEF**

WHEREFORE, Hastings prays for relief as follows:

A.    A declaration that the Defendants breached their fiduciary duties;

B.    An order compelling the disgorgement of all fees paid and incurred, directly or indirectly, to Principal subsidiaries and affiliates by the Plans, including disgorgement of profits thereon;

C.    An order compelling the Defendants to restore all losses to the Plans arising from Defendants' violations of ERISA;

---

[30]    *See Nelsen v. Principal Global Investors Trust Co*., 362 F. Supp. 3d 627, 638-42 (S.D. Iowa 2019) (denying motion to dismiss in part).

D.      An order granting equitable restitution and other appropriate equitable monetary relief against Defendants;

E.      Such other equitable or remedial relief as may be appropriate, including the permanent removal of Defendants from any positions of trust with respect to the Plans, the appointment of independent fiduciaries to administer the Plans, and rescission of the Plans' investments in Principal investment options;

F.      An order certifying this action as a class action, designating the Class to receive the amounts restored or disgorged to the Plans, and imposing a constructive trust for distribution of those amounts to the extent required by law;

G.      An order enjoining Defendants collectively from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

H.      An order awarding Hastings and the Class their attorneys' fees and costs pursuant to ERISA §502(g), 29 U.S.C. §1132(g) and/or the Common Fund doctrine; and

I.      An order awarding such other and further relief as the Court deems equitable and just.

Dated:  February 12, 2021                    PUGH HAGAN PRAHM PLC

                                             _____
                                             *s/ Siobhan Briley*
                                             Siobhan Briley
                                             425 E. Oakdale Blvd., Suite 201
                                             Coralville, IA 52241
                                             Telephone: 319-251-2028
                                             sbriley@pughhagan.com

                                             SCOTT+SCOTT ATTORNEYS AT LAW LLP
                                             Garrett W. Wotkyns*
                                             8068 East Del Acero Drive
                                             Scottsdale, AZ 85258
                                             Telephone: 480-889-3514
                                             gwotkyns@scott-scott.com
                                             *To be admitted pro hac vice*